IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MARY W.,

        **Plaintiff,**

v.                                      **Case No.: 2:23-cv-00045**

KILOLO KIJAKAZI,
**Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be

**AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On April 2, 2019, Plaintiff Mary W. ("Claimant") protectively filed for DIB, alleging a disability onset date of August 15, 2017 due to "bipolar disorder, herniated disc in cervical spine, old fracture at T6-T7, sciatica, migraines, prior history of seizures, incontinence (wears pads or diapers), high blood pressure, trouble sleeping, anxiety, and schizophrenia." (Tr. at 230, 251). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on February 28, 2022 before the Honorable Valerie Bawolek, Administrative Law Judge (the "ALJ"). (Tr. at 36-64). By written decision dated May 2, 2022, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 10-35). The ALJ's decision became the final decision of the Commissioner on November 30, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a Transcript of the Administrative Proceedings. (ECF No. 6). Claimant filed a Brief seeking judgment on the pleadings, (ECF No. 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a reply, (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 48 years old on her alleged disability onset date and 53 years old on the date of the ALJ's decision. (Tr. at 27). She obtained a general education diploma (GED), communicates in English, and previously worked as a cashier. (Tr. at 250, 252,

253).

### III.  <u>**Summary of ALJ's Decision**</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"), found at 20 C.F.R § Pt. 404, Subpt. P, App. 1. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

3

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to

4

do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a mental disorder described in the Listing. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2022. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 15, 2017, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity; osteoarthritis and rheumatoid arthritis with bilateral total knee replacements; cervical and lumbar degenerative disc disease; compression fracture of the thoracic spine; depression/substance induced mood disorder/bipolar disorder; anxiety/panic disorder; and opioid use disorder, severe, on maintenance therapy. (*Id.*, Finding No. 3). The ALJ also considered Claimant's diagnoses of pelvic pain, urinary incontinence, onychomycosis, hypertension, hyperlipidemia,

candidiasis of skin, spider bite on the right foot, gastroesophageal reflux disease (GERD), gallstone, hypokalemia, upper respiratory infection, influenza, cellulitis, acute kidney injury, hyperglycemia, diarrhea, fatty liver, nausea with vomiting, groin abscess, urinary tract infection, irritable bowel syndrome, dry eye syndrome, presbyopia, right central corneal opacity, bilateral cataracts, anemia, vitamin D deficiency, metabolic alkalosis, acute kidney injury, elevated troponin level, weakness, seizure disorder, vitamin D deficiency, leukopenia, hypocalcemia, bipolar mood disorder, and schizoaffective disorder, but the ALJ found that the impairments were non-severe. (Tr. at 16).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-19, Finding No. 4). Thus, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) except that she can sit for a total of 6 hours during an 8-hour workday; she can stand for a total of 4 hours total during an 8-hour workday; she can walk 2 hours total during an 8-hour workday; she can walk 15-20 minutes at a time and stand 30 minutes at a time, but would require a brief, about five-minute, break after the walking or the standing. She can never kneel, crawl, or climb ladders, ropes, or scaffolds; she can occasionally balance, bend/stoop, crouch, and climb ramps and stairs. She can frequently operate hand and foot controls. She must avoid exposure to unprotected heights, moving mechanical parts, and excessive vibration. Additionally, she must work independently of others and have a job which does not require customer service; she can tolerate occasional contact with supervisors and co-workers. She requires a work environment without a fast pace or strict production quotas.

(Tr. at 19-27, Finding No. 5).

At the fourth step, the ALJ concluded that Claimant could not perform her past relevant work. (Tr. at 27, Finding No. 6). Therefore, the ALJ considered Claimant's prior work experience, age, and education to determine whether she could engage in other

substantial gainful activity. The ALJ considered that (1) Claimant was born in 1968 and was defined as a younger individual on her alleged disability onset date, but she subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of whether she had transferable skills. (Tr. at 27-28, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled light exertional work as a collator operator, router, or tabber. (Tr. at 28, Finding No. 10). Consequently, the ALJ decided that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's RFC finding is internally inconsistent, which resulted in an inadequate hypothetical to the VE. (ECF No. 11 at 1, 3). First, she asserts that the ALJ committed the same error that the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") found warranted remand in *Dowling v. Comm'r of SSA*, 986 F.3d 377 (4th Cir. 2021). (ECF No. 11 at 4). According to Claimant, like the administrative law judge in *Dowling*, the ALJ did not cite the correct regulatory framework, 20 C.F.R. § 404.1545 and SSR 96-8p, in the RFC portion of the decision, and did not show that the RFC was rooted in a function-by-function analysis of how Claimant's impairments impacted her ability to work. (*Id*.). Second, Claimant argues that the "'math' of the ALJ's RFC doesn't work," and, "in any event, it is not clear what [Claimant] is doing during these numerous breaks dictated by the RFC." (*Id*.). Claimant

notes that the ALJ assessed that she must take brief, about five-minute, breaks after walking for 15 to 20 minutes or standing for 30 minutes, but the ALJ did not specify what Claimant would be doing during the breaks. (*Id.*). Claimant contends that, if the breaks are treated as rest periods, the total amount of breaks exceeded the percentage of off-task time employers typically tolerate—at least according to the VE's testimony. (*Id.*). Further, Claimant argues that the amount of time the ALJ found that Claimant could sit, stand, and walk totaled 12 hours, which exceeded an eight-hour workday. (*Id.* at 5).

In response to Claimant's challenges, the Commissioner argues that Claimant's reliance on *Dowling* is misplaced and inaccurate. (ECF No. 12 at 10). The Commissioner maintains that the Fourth Circuit did not establish in *Dowling* that an ALJ must *cite to* 20 C.F.R. § 404.1545 and SSR 96-8p. (*Id.*). Rather, the Fourth Circuit found that the ALJ in *Dowling* did not *apply* the regulatory framework of 20 C.F.R. § 404.1545 and SSR 96-8p in assessing the claimant's RFC. (*Id.*). In *Dowling*, the ALJ based the RFC finding entirely on the SSRs relating to the subjective symptom analysis, rather than the function-by-function assessment required by 20 C.F.R. § 404.1545 and SSR 96-8p. (*Id.*). Here, by contrast, the Commissioner notes that the ALJ cited 20 C.F.R. § 404.1545 and SSR 96-8p and performed the required function-by-function analysis. (*Id.*). She points out that Claimant does not assert that the ALJ omitted any specific limitations from the RFC or neglected to consider certain functional abilities. (*Id.*). Instead, Claimant focuses on the "math" of the work breaks that the ALJ included in the RFC. In that respect, the Commissioner notes that Claimant fundamentally misunderstands what the RFC represents. (*Id.* at 11). The RFC constitutes the most that Claimant can do on a regular and continuing basis, but it does not indicate that Claimant would perform all of the exertional activities outlined throughout each day. (*Id.* at 11-12). Further, the

Commissioner identifies that employees are entitled to two scheduled breaks and a lunch period during each workday, and nothing in the decision reflects that the breaks included in the RFC were in addition to regularly scheduled breaks. (*Id.* at 12) (citing SSR 96-9p, 1996 WL 374185, at *6-7). According to the Commissioner, by indicating that Claimant could take approximately five minute breaks after walking or standing, the ALJ explicitly gave Claimant the option to sit, stand, or walk with intermittent breaks during the workday. (*Id.* at 12-13). She explains how the "math" in the RFC finding is possible, contrary to Claimant's assertion. (*Id.* at 13). Overall, the Commissioner emphasizes that the ALJ assessed RFC limitations based on her careful review of the evidence, she thoughtfully explained her analysis, and Claimant does not identify any functions or evidence that the ALJ failed to consider. (*Id.* at 13-14). As such, the Commissioner argues that the ALJ properly relied on the VE's testimony to determine that Claimant could perform other work that existed in significant numbers in the national economy. (*Id.* at 14-15).

In reply, Claimant reiterates that the ALJ conflated the RFC and subjective symptom analyses, precisely like the ALJ in *Dowling*. (ECF No. 13 at 1-2). As to work breaks, Claimant notes that light exertional work presumes a job that requires standing/walking for approximately six hours in each eight-hour workday. (*Id.* at 3). Thus, in Claimant's view, any break taken in the middle of a task that must be performed while standing or walking amounts to the worker being off task. (*Id.*). Claimant contends that it is, at best, unclear whether the breaks listed in the RFC could fit within regularly scheduled breaks. (*Id.*). Concerning the fact that she did not identify specific functions that the ALJ did not address, Claimant reiterates that her argument is that the RFC assessment is inconsistent and unexplained which generally precludes meaningful review

and resulted in an inadequate hypothetical to the VE. (*Id.* at 2-4).

## V.  **Relevant Evidence**

The undersigned thoroughly examined the entire record. Claimant does not assert any challenges regarding the ALJ's assessment of her mental impairments. Therefore, that evidence is omitted from the following discussion, with only the most relevant evidence addressed below.

### A. *Treatment Records*

On July 21, 2017, Claimant presented to the emergency room at Charleston Area Medical Center complaining of left shoulder pain that persisted for two months and had worsened that night. (Tr. at 332). She worked as a cashier, and her employer instructed her to go to the emergency room if she intended to leave work. (*Id.*). Claimant was diagnosed with a sprained shoulder and muscle spasm. (*Id.*). The following year, on August 21, 2018, Claimant established care with Lisa Queen, FNP, as a new patient. (Tr. at 431). Nurse Queen diagnosed Claimant with hypertension and depressive disorder. (Tr. at 433). Claimant advised Nurse Queen on December 13, 2018 that she had a remote medical history of fracturing her thoracic spine in 2004 when she fell during a seizure. (Tr. at 420). Claimant stated that she bought pills for low back pain and started treatment at a suboxone center. (*Id.*). Her last seizure was three months earlier. (*Id.*). Claimant participated in physical therapy in July and August 2019 for her low back and right lower extremity pain, but she reported no improvement. (Tr. at 349-50).

On February 1, 2020, Claimant presented to Boone Memorial Hospital after she fell while collecting yard trimmings two weeks earlier. (Tr. at 820). She was diagnosed with lumbar pain and strain and cervical and lumbar disc degeneration. (*Id.*). In March 2020, Claimant also complained of increased osteoarthritis pain in both knees. (Tr. at

601). She noted that the injection that she received helped for a couple of weeks, but the pain returned. (*Id.*). Claimant underwent left total knee replacement in June 2020 and right total knee replacement in October 2020, both of which dramatically improved her pain. (Tr. at 545, 1253, 1257, 1259).

On June 27, 2021, Claimant returned to Boone Memorial Hospital Emergency Department due to spasms, tightness, and cramping in her feet and legs, which started that morning. (Tr. at 1245). She could bear weight and ambulate without difficulty, but she was concerned that her potassium was low because it caused cramping in the past. (*Id.*). Claimant's body mass index was 34.46. (Tr. at 1247). She was prescribed Zanaflex. (*Id.*).

### B. Evaluations, Opinions, and Prior Administrative Findings

On December 4, 2019, state agency physician Larry Curnutte, M.D., assessed that Claimant could perform light exertional work, including standing and/or walking with normal breaks for a total of six hours in an eight-hour workday and sitting with normal breaks for a total of six hours in an eight-hour workday. (Tr. at 94). In support of those limitations, Dr. Curnutte noted Claimant's normal physical examinations and the fact that the alleged seizures were pseudoseizures. (*Id.*). Additionally, Dr. Curnutte assessed that Claimant could occasionally climb ladders, ropes, or scaffolds and perform other postural activities frequently. (Tr. at 95). He opined that Claimant did not have any environmental, manipulative, communicative, or visual limitations. (*Id.*).

On August 17, 2020, Laura Cunnings, FNP-C, performed a consultative physical examination of Claimant. Claimant mentioned that she suffered from back pain since she fell in the early 2000's and fractured her T6 and T7 vertebrae. (Tr. at 771). She reported occasional sharp, stabbing pain in her back and persistent aching with radiation into her

legs. (*Id.*). Claimant had not been referred to an orthopedist but was treated with medication. (*Id.*). She also complained of seizures for the past 20 years and suffering from a weekly migraine, but she was not taking any medication for either impairment. (*Id.*). Claimant's blood pressure was controlled, she was in physical therapy following her left knee replacement, and she was awaiting a right knee replacement. (*Id.*). Her height was 5 feet 7 inches, she weighed 244 pounds, and she smoked one pack of cigarettes per day. (Tr. at 772). Claimant's posture was slumped, and she was ambulating with a cane due to her recent left knee replacement. (Tr. at 772, 773). She could perform a tandem gait with a cane and get on and off of the examination table without difficulty, had difficulty squatting, experienced no pain with bilateral supine straight leg raising tests, had slightly limited range of motion in her left knee and shoulders, showed no evidence of atrophy, and her sensation and reflexes were intact. (Tr. at 773).

On August 20, 2020, state agency physician Narendra Parikshak, M.D., affirmed Dr. Curnutte's initial RFC assessment except that she further limited Claimant to only occasionally climbing ramps and stairs, kneeling, crouching, and crawling, as well as no concentrated exposure to extreme cold and wetness or moderate exposure to hazards. (Tr. at 114-15).

Medical expert David Owens, M.D., testified during Claimant's administrative hearing on February 28, 2022. He opined that Claimant could perform a range of light exertional work that included a total of six hours of sitting, four hours of standing, and two hours of walking in an eight-hour workday; occasional climbing of ramps and stairs; balancing, bending, stooping, and crouching; never kneeling, crawling, or climbing ladders, ropes, or scaffolds; frequently operating hand and foot controls; and never being exposed to unprotected heights, moving mechanical parts, or excessive vibration. (Tr. at

42). Claimant's counsel questioned Dr. Owens if Claimant required a sit/stand option and, if so, how often she needed to alternate positions. (*Id.*). Dr. Owens added that Claimant could stand for 30 minutes before taking a brief five-minute break, and she could walk for 15 to 20 minutes before needing a brief break. (Tr. at 43). He opined that Claimant's sitting limitations could be accommodated by normal work breaks, and he did not anticipate that she would generally be off task due to her physical impairments. (*Id.*).

### C. Claimant's Statements

During the administrative hearing on February 28, 2022, Claimant testified that she could not work because she could not stand or sit for very long due to issues related to her knees, hips, and rheumatoid arthritis. (Tr. at 56). She estimated that she could sit for 15 minutes before needing to stand up or move around and stand in one place for 15 minutes before needing to sit or lie down. (Tr. at 57). Claimant testified that she could not walk the length of a football field without needing to rest or pause. (*Id.*).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a

*de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.  Discussion**

Claimant asserts an overall challenge that the "ALJ's RFC is internally inconsistent, undermining the [VE] testimony it is premised upon." (ECF No. 11 at 3). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and

carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In order for a VE's opinion to be relevant, it must be in response to a proper

hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

### A. Dowling

Claimant argues that the ALJ's RFC assessment is deficient for the reasons expressed in *Dowling*, 986 F.3d at 387. (ECF No. 11 at 3-4). According to Claimant, the ALJ improperly conflated the RFC assessment with the evaluation of symptoms, treating them as one and the same. (ECF No. 13 at 2). In *Dowling*, the Fourth Circuit concluded that the administrative law judge relied on an incorrect regulatory framework when he assessed the claimant's RFC. *Dowling*, 986 F.3d at 388. The Court explained:

[The ALJ] did not cite to 20 C.F.R. § 416.945, the section of the Code of Federal Regulations that is titled "Your residual functional capacity" and explains how ALJs should assess a claimant's RFC. Nor did he cite to SSR 96-8p, the 1996 Social Security Ruling that provides guidance on how to properly evaluate an RFC. Finally, the ALJ did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work. Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a claimant's] symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [ ] record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from [the claimant's] symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

*Id.* at 387.

The ALJ's decision in this case is plainly distinguishable from the decision in *Dowling*. Here, the ALJ clearly identified the correct regulatory framework for assessing Claimant's RFC earlier in the decision. (Tr. at 15) (discussing 20 C.F.R. §§ 404, 1520(e), 404.1545 and SSR 96-8p). More importantly, although the ALJ did not repeat those sources in the RFC portion of the decision, the ALJ very clearly performed a thorough function-by-function analysis and logically connected the evidence to each RFC limitation that she assessed. *See, e.g., Michelle T. v. Kijakazi*, No. 2:23-CV-00176, 2023 WL 5811259, at *11 (S.D.W. Va. Aug. 17, 2023), *report and recommendation adopted,* 2023 WL 5804316 (S.D.W. Va. Sept. 7, 2023) (finding no error when the ALJ only cited the RFC framework in a "boilerplate introductory section" of the decision, but nonetheless performed the functional analysis); *Davis v. Comm'r of Soc. Sec.*, No. 3:20-CV-00339-RJC, 2022 WL 680211, at *4 (W.D.N.C. Mar. 7, 2022) ("Here, the ALJ, like the ALJ in the *Dowling* case, did not cite to 20 C.F.R. § 416.945 or SSR 96-8p. However, unlike the ALJ

in the *Dowling* case, the ALJ here went through a function-by-function analysis. [...] The ALJ supported his functional analysis with medical and other record evidence. Tellingly, Plaintiff failed to identify any specific functional area that the ALJ failed to address and instead relied on generalized, conclusory arguments. Thus, to the extent the ALJ's analysis is deficient in some way by, for example, not citing to the correct source, there is no per se rule for remand and such error is harmless as the ALJ went through a function-by-function analysis as required by the framework and Plaintiff failed to specify a non-harmless error."); *Elizabeth T. v. Kijakazi*, No. CV 21-1046-BAH, 2022 WL 2649055, at *3 (D. Md. July 8, 2022) ("I also do not find this case to be similar to *Dowling*. In *Dowling*, the Fourth Circuit found error in an ALJ's RFC assessment because the ALJ failed to engage in a "function by function" analysis as required by controlling precedent. [...] Unlike *Dowling*, the ALJ here engaged in a lengthy "three step process" by considering all of Plaintiff's impairments, providing a sufficient narrative discussion regarding each, and making a finding as to the Plaintiff's RFC.").

In this matter, the ALJ thoroughly discussed her analysis of Claimant's allegations, clinical records, test results, physical and mental consultative examinations, prior administrative findings, administrative hearing testimony from both a physician and psychologist, and the decision on Claimant's previous application for benefits. (Tr. at 20-27). The ALJ specifically considered Claimant's ability to sit, walk, stand, and perform other relevant functions. (*Id.*). The ALJ clearly articulated the basis for the RFC findings based on that functional analysis. For instance, the ALJ explained that Claimant's history of back pain with evidence of remote thoracic spine fracture restricted her to light exertional work with additional postural and environmental limitations. (Tr. at 22). The ALJ likewise found that Claimant's history of knee pain and bilateral knee replacement

surgeries limited Claimant to light exertional work with additional postural, manipulative, and environmental limitations. (*Id.*). The ALJ was persuaded by the most restrictive RFC opinion in the record, which was rendered by Dr. Owens during Claimant's administrative hearing. (Tr. at 23). The ALJ found that Dr. Owens's opinion was based on a more expanded record than the state agency consultants reviewed; Dr. Owens cited specific exhibits in support of his opinions; and Dr. Owens answered Claimant's counsel's questions regarding the limitations that he assessed. (Tr. at 23). Indeed, the ALJ's RFC finding precisely matches Dr. Owens's opinion, including the sit-stand limitations that were elicited by Claimant's counsel's questioning. (Tr. at 19, 42-43).

Therefore, there is no merit to Claimant's argument that the RFC assessment suffers from the same flaws that the Fourth Circuit identified in *Dowling*. The ALJ performed a "separate and distinct" RFC analysis, which was not based entirely on her evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms. The ALJ explicitly connected the evidence, on a function-by-function basis, to the RFC findings. Consequently, the undersigned **FINDS** that the ALJ utilized the correct regulatory framework in assessing Claimant's RFC.

### B. "Math" of the RFC Assessment

Claimant next argues that the "math" of the ALJ's RFC assessment does not "work" because the ALJ assessed that she needs 14 to 16 breaks per day lasting a total of 70 to 80 minutes. (ECF No. 11 at 4). From Claimant's perspective, if those breaks are treated as rest periods, she would be off task at least 15 percent of the workday, which exceeds the threshold that employers typically tolerate, according to the VE. (*Id.*). Also, Claimant argues that the ALJ found that she can work a total of 12 hours per day and did not explain what Claimant would be doing during the work breaks. (*Id.* at 4-5).

First, addressing the "breaks" identified in Claimant's RFC, the ALJ did not indicate that these are "rest" periods, as Claimant suggests in her brief. (ECF No. 11 at 2) (stating that the ALJ found that she needed to "rest" after periods of walking or standing). Claimant speculates that, because the ALJ did not specify what she would be doing during the breaks, it could be assumed that Claimant would be off task during that time. She indicates that the ALJ's decision does not provide sufficient clarity to determine the nature of the breaks and how they impact her ability to work. This argument is unavailing. The ALJ assessed that Claimant can sit for no more than six hours, stand for no more than four hours, and walk for no more than two hours total in an eight-hour workday. (Tr. at 19). She can only stand for 30 minutes at one time and walk for 15 to 20 minutes, and she must take "a brief, about five-minute, break after the walking or the standing." (*Id.*).

The ALJ did not conclude, as Claimant posits, that Claimant required 14 to 16 extra work breaks per day lasting a total of 70 to 80 minutes. Claimant's calculation evidently assumes a job which requires the maximum amount of standing and walking that Claimant can perform with no standard work breaks. SSR 96-9p explains that employees are entitled to a morning break, lunch period, and afternoon break at approximately two hour intervals within an eight-hour workday. *Sabrina W. v. Kijakazi*, No. 2:21CV37, 2021 WL 6750786, at *8 (E.D. Va. Dec. 22, 2021), *report and recommendation adopted*, 2022 WL 256279 (E.D. Va. Jan. 26, 2022) (citing SSR 96-9p, 1996 WL 374185, at *6). ("SSR 96-9p"). The breaks are typically understood to consist of a 15 minute break in the morning, a 30 minute lunch period, and a 15 minute break in the afternoon. *Id.* (collecting cases). Per SSR 96-9p, the customary scheduled breaks are commonly used to accommodate an employee's need to alternate between sitting and standing. *Id.* (citing SSR 96-9p, 1996 WL 374185, at *7). Nothing in the ALJ's decision indicates that Claimant

required "additional break periods each day" in addition to standard breaks, as Claimant states. (ECF No. 11 at 4).

Furthermore, and most importantly, regardless of the calculations, the ALJ's decision as a whole makes abundantly clear that Claimant would not be off task during the standing or walking breaks. The ALJ noted Dr. Owens's testimony that Claimant would need to take brief, about five minutes, break after standing for 30 minutes or walking for 15 to 20 minutes, and Dr. Owens's explanation that Claimant would not experience significant time off task. (Tr. at 24). The ALJ found Dr. Owens's opinion persuasive and included the same limitations. (Tr. at 19, 23). In addition, the ALJ relied upon the VE testimony, and the VE expressly equated the breaks to a job that allowed Claimant to sit or stand at will. (Tr. at 28, 62). Overall, the ALJ provided sufficient information to explain that taking a "break" after walking or standing meant that Claimant must change positions after standing for 30 minutes or walking for 15 to 20 minutes, then she can resume that exertional activity up to a total amount of six hours of sitting, four hours of standing, and two hours of walking per workday. For example, it is clear from the decision that Claimant could stand for 30 minutes, sit for five minutes, then resume standing for another 30 minutes, up to four hours of standing in one workday.

The undersigned is not speculating or assuming what the ALJ meant that Claimant would be doing during work breaks, but rather is basing that determination on the decision itself. Undoubtedly, the ALJ could have expressly articulated what Claimant would be doing during breaks or used different terminology instead of referring to the changing of positions as a "break." However, the ALJ utilized the terminology used by the medical expert, and the Court's role is reviewing the Agency's decision is not a quest for a

perfectly written decision. CITE. *Six v. Colvin*, No. 3:15-CV-14377, 2016 WL 11483865, at *9 (S.D.W. Va. Oct. 25, 2016), *report and recommendation adopted,* 2016 WL 7040850 (S.D.W. Va. Dec. 1, 2016) ("[A]n ALJ is not expected to produce a written decision that embodies procedural perfection."); *Reynolds v. Colvin*, No. 6:13-CV-22604, 2014 WL 4852242, at *21 (S.D.W. Va. Aug. 19, 2014), *report and recommendation adopted,* 2014 WL 4852250 (S.D.W. Va. Sept. 29, 2014) "[A]n ALJ is never held to the standard of producing a perfect decision [...].").

There is no particular language or format that an ALJ must use in the RFC analysis so long as there is sufficient development of the record and explanation of the findings to permit meaningful review. *Jonathan W. v. Kijakazi,* No. 2:23-CV-00315, 2023 WL 5767748, at *9 (S.D.W. Va. Aug. 17, 2023), *report and recommendation adopted,* 2023 WL 5751445 (S.D.W. Va. Sept. 6, 2023) (citations omitted). Notably, the decision must be read as a whole, and the Court is limited to determining whether the ALJ applied the correct law and there is more than a scintilla of evidence to support the ALJ's factual findings. *Id.*; *Hays*, 907 F.2d at 1456. In this case, it is clear what the ALJ meant based on the decision as a whole, and the RFC assessment is well supported by the record, particularly Dr. Owens's testimony.

Claimant argues that the definition of light exertional work presumes a job that requires standing/walking for approximately six hours in a workday, and thus any break in a task that must be performed standing/walking must amount to a worker being off task. (ECF No. 13 at 3). First of all, a light exertional job requires a good deal of walking or standing *or*, in more limited cases, sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b); SSR 83-10 1983 WL 31251, at *5. The ALJ, in this case, found that Claimant could perform a "range of light work," including

frequently operating hand and foot controls. (Tr. at 19). Social Security Ruling 83–12 specifically contemplates a situation such as this in which the claimant cannot do the prolonged standing or walking contemplated for most light exertional work, and the Ruling explains how the ALJ should address the issue. SSR 83-12, 1983 WL 31253, at *4. SSR 83-12 specifies that the option to sit or stand at will is not ordinarily available in unskilled jobs. *Id.* Thus, a VE should be consulted to clarify the implications for the occupational base. *Id.* In this case, the ALJ expressly complied with SSR 83-12's directive. She posed a hypothetical to the VE which included Claimant's limitations, and the VE testified that the changing of positions amounted to sitting or standing at will, which would significantly erode the vocational base. (Tr. at 62). Nonetheless, the VE explained that there were jobs that were compatible with the specified limitations, including the light exertional positions of collator operator, router, and tabber. (Tr. at 62). Therefore, the ALJ properly applied the law in reaching her decision. Claimant offers no authority for her contention that changing positions equates to a worker being off task.

Setting aside Claimant's argument concerning work breaks and being off task, Claimant's contention that the ALJ concluded that she can work for 12 hours per day is similarly unfounded. The ALJ assessed that Claimant can sit for no more than six hours, stand for no more than four hours, and walk for no more than two hours total in an eight-hour workday. That assessment simply meant that Claimant can perform a job that does not exceed each of those thresholds. The RFC represents the maximum activities that Claimant can perform despite her limitations on a regular and continuing basis. It does not mean that Claimant will perform the total amount of all of those exertional activities within each workday.

Although the "math" of RFC findings often equal eight hours, it is not unusual for

the total of the sitting, standing, and walking limitations to exceed an eight-hour workday. *See, e.g., Pearson v. Colvin*, 810 F.3d 204, 205–06 (4th Cir. 2015) (remanding for other reasons, but identifying no issue with the RFC finding and hypothetical that limited the claimant to sitting six hours and standing/walking for six hours total in an eight hour workday); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 745 (N.D.W. Va. 2009) (noting that the RFC limited the claimant to sitting six hours and standing/walking for six hours total in an eight hour workday). Indeed, the prior administrative findings in this case "totaled" 12 hours, including six hours of sitting and six hours of standing/walking. (Tr. at 94, 113). Accordingly, the undersigned **FINDS** no merit to Claimant's contention that the "math" in the ALJ's RFC finding is flawed.

For all of the above reasons, the undersigned **FINDS** that the ALJ's RFC finding is supported by substantial evidence.

## VIII.  <u>Proposal and Recommendations</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date

of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 7, 2023

Cheryl A. Eifert
United States Magistrate Judge